OPINION
{¶ 1} Defendant-appellant Timothy Foster appeals from his convictions on two counts of Domestic Violence and one count of Felonious Assault. Foster contends that the convictions are not supported by the evidence, and are against the manifest weight of the evidence. We conclude that there is evidence in the record to support the convictions, and that the convictions are not against the manifest weight of the evidence.
 {¶ 2} Foster further contends that the trial court committed plain error by permitting the State to introduce evidence of other bad acts committed by him, and that his trial counsel was ineffective for having failed to object to this testimony.
 {¶ 3} The Domestic Violence offenses with which Foster was charged required, as an element of proof, proof of his having previously been convicted of Domestic Violence. The additional admission of his previous convictions for Disorderly Conduct and one previous conviction for Assault added little potential prejudice. We conclude, therefore, that the admission of this evidence did not rise to the level of plain error and that trial counsel's failure to object to this evidence, and trial counsel's tactical decision to have Foster acknowledge to the jury that he was "no saint," did not constitute ineffective assistance of counsel.
 {¶ 4} Foster also contends that the introduction of evidence to impeach the testimony of the victim, who testified on behalf of the State, constituted plain error, because the State had not shown that it was surprised by her testimony. Foster further contends that his trial counsel was ineffective for having failed to object to the impeachment evidence.
 {¶ 5} We conclude that the State's introduction of evidence to impeach the testimony of the victim did not rise to the level of plain error. There was abundant evidence in the record to support the conviction, apart from any testimony elicited for the purpose of impeaching her testimony. Furthermore, although the State called the victim as its witness, her direct testimony assisted the State in some respects, and Foster in other respects, so that it was a sound strategic decision, by Foster's trial counsel, to permit the victim to testify as a State's witness, and then argue to the jury, as he did, that the victim's testimony corroborated Foster's version of events. We conclude, therefore, that the introduction of this impeachment testimony by the State did not constitute plain error, and defense counsel's failure to object did not constitute ineffective assistance of counsel.
 {¶ 6} Because we find no merit to any of Foster's assignments of error, the judgment of the trial court is Affirmed.
 I {¶ 7} The charges against Foster arise out of two incidents. The first of these occurred on April 13, 2003. The second occurred on July 14, 2003. The alleged victim in both incidents was Beth Fyffe.
 {¶ 8} In the early morning hours of April 13, 2003, the Fairborn Police Department received an "open air" 911 call. This is a 911 call where the line is left open, but no one is talking or responding. A tape of that call was received in evidence. On it can be heard a muffled female voice crying for help. In his testimony, Foster acknowledged hearing Fyffe's voice on the recording of the 911 call saying, "please don't hurt me anymore." Police were dispatched to the location, 1812 Wilbur. After knocking on the door and getting no response, the police kicked the door open. The police found Foster and Fyffe inside the apartment. They saw Foster shoving Fyffe back into a bathroom, while he came out to talk to them. He looked like he'd been in a fight, and was intoxicated.
 {¶ 9} Joshua Lawrence, a Fairborn firefighter paramedic, was dispatched to attend to Fyffe. Lawrence asked her questions "to lead us in the direction for appropriate care." Fyffe told Lawrence that "she had been struck in the head repeatedly and then drag [sic] by her hair on that evening." Lawrence observed a bald spot on Fyffe's head, where her hair had been pulled out. Lawrence described the bald spot as about two inches across, and one and one half to two inches up and down. Lawrence said that Fyffe also told them that she had been choked until she had passed out.
 {¶ 10} Fyffe testified concerning this incident. Although she acknowledged that a verbal altercation occurred, and that she did make the 911 call, she minimized the physical nature of the confrontation. She did not remember having been choked, but did remember his pulling her hair. She acknowledged having given a written statement concerning this incident, which was received in evidence, but testified that when she gave that statement she "was pretty angry at Tim and wanted the worst to happen to him." She testified that she loved Foster, and would always love him.
 {¶ 11} In his testimony, Foster acknowledged that there had been a verbal altercation that night, but likewise minimized the physical confrontation. Although he acknowledged that he had pulled a clump of Fyffe's hair out of her head, he explained that this was the accidental result of having attempted to restrain her by pulling on her coat, and accidentally grabbing some of her hair, as well. Foster acknowledged having discussed this incident in a phone call to his mother from the Clark County Jail. A recording of this conversation was received in evidence. Foster acknowledged that during this conversation he told his mother, among other things, "I tell you the truth, I did, I went hog wild on her [referring to Fyffe]," but explained that he was lying to his mother in order to discourage her from exacting physical vengeance on Fyffe.
 {¶ 12} As a result of the incident on April 13, 2003, Foster was charged with one count of Felonious Assault, one count of Domestic Violence, and one count of Abduction.
 {¶ 13} Foster and Fyffe both testified that they were in a loving relationship, that they resided together, at least some of the time, that they had sexual relations, and that on one occasion they both believed that Foster had impregnated Fyffe.
 {¶ 14} At some point following the incident on April 13, 2003, a civil protection order was entered barring Foster from contact with Fyffe. This order was in effect on July 14, 2003, when the second incident occurred. On that date, at the time, or shortly after the time, that the bars in the area were closing, Anita Buehrig, who disclaimed knowing anyone involved in this matter, testified that she became aware of an altercation occurring outside a bar 200 to 300 yards from where she was, on the porch of her home. Initially, she could not see what was happening, because of a tree in the way, but she heard two voices, which she thought to be one male and one female, involved in an altercation that she described as follows:
 {¶ 15} ". . . it was struggle, it was conflict, and it was frightening." "There was just something; it was urgent, it was conflict, there was aggression, and there was — it sounded like there was someone being hurt badly and someone else pleading."
 {¶ 16} Buehrig called 911, and reported what she had heard. At the request of the dispatcher, she went out to further observe. She described what she then observed as follows:
 {¶ 17} "A. By that time they had come actually into my line of sight past the tree. They were in the [alley] coming back from the Main Place. And I saw a woman on the ground and a man above hitting her, hitting her around the sort of head and shoulders area. I didn't have a clear view, it was some distance, but I could see exactly what was going on.
 {¶ 18} "Q. How would you describe the man's demeanor when you went outside?
 {¶ 19} "A. Very aggressive, very upset.
 {¶ 20} "Q. And how would you describe the woman's demeanor when you went outside?
 {¶ 21} "A. She was pleading for mercy."
 {¶ 22} Wesley Frederick, a Fairborn police officer dispatched to the scene, found Fyffe on the ground, with Foster on top of her. Foster was trying to pull her up, and then grabbed her and was pulling her into the alley. Fyffe was in a fetal position, and said to Frederick, within ten seconds of his arrival, "help."
 {¶ 23} Aaron Eikenbarry, another Fairborn police officer dispatched to the scene, asked Fyffe what had happened. Fyffe told Eikenbarry that Foster had grabbed her and had dragged her toward his apartment. Fyffe, who was bleeding from the head, started to fill out a witness statement while in the back of Eikenbarry's cruiser, when she appeared to lose consciousness. Some of her hair had been pulled out.
 {¶ 24} Joshua Lawrence, the same paramedic firefighter who had been dispatched to the April 13 incident, was dispatched to the July 14 incident to attend to Fyffe. Lawrence testified that Fyffe had an abrasion with swelling to the right side of her head, and a deformity and swelling to her left arm. When Lawrence asked Fyffe how she got her injuries, for treatment purposes, Fyffe told Lawrence that she was dragged out of the establishment she was in and she was kicked and punched.
 {¶ 25} Both Fyffe and Foster testified concerning the July 14 incident. Again, while they both acknowledged a verbal altercation, they both denied any physical violence. They both testified that Fyffe had been hit, and apparently knocked down, by a passing truck mirror, and that Foster was attempting to pick her up from the ground when the police arrived. However, when Foster gave a statement to Karen Kordish, the investigating police detective, concerning this incident, he did not mention that Fyffe had been "clipped by a truck."
 {¶ 26} As a result of July 14, 2003 incident, Foster was charged with one count of Domestic Violence and one count of Abduction.
 {¶ 27} Foster was tried by a jury. At the conclusion of the State's evidence, Foster moved for a judgment of acquittal. The trial court denied the motion with respect to the Domestic Violence counts and the Felonious Assault count, but granted the motion with respect to the two Abduction counts. At the conclusion of the trial, Foster was found guilty of the Felonious Assault count, and of both Domestic Violence counts, both of which were charged as offenses involving a previous conviction for Domestic Violence. A judgment of conviction was entered, and Foster was sentenced accordingly. From his conviction and sentence, Foster appeals.
 II {¶ 28} Foster's Second Assignment of Error is as follows:
 {¶ 29} "The appellant's conviction for domestic violence is not supported by sufficient evidence and is against the manifest weight of the evidence."
 {¶ 30} In support of this assignment of error, Foster contends that there is insufficient evidence in the record to establish that Fyffe was a family or household member, an essential element of both counts of Domestic Violence. Essentially, Foster contends that there is insufficient evidence in this record to support the jury's conclusion that he and Fyffe cohabited.
 {¶ 31} We agree with the State that there was ample evidence to support the jury's verdict in this regard. Fyffe testified that she stayed at 1812 Wilbur with Foster "most of the time," that they shared the same bedroom, that they had sexual relations, and that she had furnished the apartment. Foster, also, testified that Fyffe had helped furnish the apartment, "for the both of us."
 {¶ 32} Foster also argues that his conviction for Domestic Violence with respect to the incident occurring on July 14, 2003, is against the manifest weight of the evidence, because Anita Buehrig did not directly observe the incident, while both Fyffe and Foster denied that Foster used violence upon Fyffe.
 {¶ 33} We conclude that this conviction is not against the manifest weight of the evidence. There is physical evidence corroborating that a violent confrontation occurred. Although both Fyffe and Foster offered testimony to explain her bruises, and perhaps even her abrasion, as the result of being hit by the truck mirror, neither offered any explanation for the hair that had been pulled out of her head, which Fairborn police officer Aaron Eikenberry observed on her clothing. Furthermore, Fyffe's statement given to a health care professional for treatment purposes, which was properly received in evidence, corroborated that she had been violently assaulted.
 {¶ 34} Foster's Second Assignment of Error is overruled.
 III {¶ 35} Foster's First Assignment of Error is as follows:
 {¶ 36} "The appellant was denied a fair trial due to the admission of prohibited prior bad acts evidence."
 {¶ 37} Foster testified in his own defense. Obviously, the State was required to prove that Foster had committed at least one previous offense of Domestic Violence, since that was an element of the two Domestic Violence offenses with which he was presently charged. Perhaps in an attempt to defuse the negative impression that prior offenses might leave in the minds of the jury, Foster's direct examination began as follows:
 {¶ 38} "Q. I've represented you in a couple of different cases, haven't I?
 {¶ 39} "A. Yes, sir.
 {¶ 40} "Q. And these cases you were in trouble with the law.
 {¶ 41} "A. Yes, sir.
 {¶ 42} "Q. You ain't no saint.
 {¶ 43} "A. You're right, sir."
 {¶ 44} An essential aspect of Foster's account of both incidents was that he was trying to protect Fyffe from dangerous characters with whom he thought she might be associating. This may have accounted for the direction that the State's cross-examination of Foster took during the following colloquy:
 {¶ 45} "Q. And, in fact, when asked about your character on direct examination, it was brought out that you're no saint, correct?
 {¶ 46} "A. Correct, sir.
 {¶ 47} "Q. And that you love her and that you can protect her.
 {¶ 48} "A. Yes, sir.
 {¶ 49} "Q. And you can protect her because you're a pretty violent man, aren't you?
 {¶ 50} "A. No, sir.
 {¶ 51} "Q. Not at all?
 {¶ 52} "A. Only when I'm protecting myself or somebody that I love, when I know somebody is trying to hurt them.
 {¶ 53} "Q. Okay. So back in 1998, July of 1998, you have a conviction out of the Fairborn Municipal Court for assault, is that not correct?
 {¶ 54} "A. Yeah, self-defense.
 {¶ 55} "Q. But a conviction?
 {¶ 56} "A. Yeah.
 {¶ 57} "Q. Though in your mind it was self-defense?
 {¶ 58} "A. Yeah.
 {¶ 59} "Q. You also have a, another conviction for domestic violence back in 1992, is that not correct?
 {¶ 60} "A. Yes.
 {¶ 61} "Q. And you have numerous convictions for disorderly conduct out of the Fairborn Municipal Court?
 {¶ 62} "A. Yes, that is when I was younger.
 {¶ 63} "Q. So back in 2002, in Case Number 2002-CRB-272, which is only two years ago, that is when you were younger?
 {¶ 64} "A. Yeah. I wised up. I quit drinking. Back then I used to drink every day. I had a drinking problem. I got into AA and I cleaned myself up, and cleaned my attitude up and cleaned myself up.
 {¶ 65} "Q. So you're a reformed alcoholic?
 {¶ 66} "A. Yes.
 {¶ 67} "Q. But yet on July 14th, you're drinking beer, is that correct?
 {¶ 68} "A. Yeah, I drunk a couple.
 {¶ 69} "Q. And as a reformed alcoholic, you went to AA?
 {¶ 70} "A. Yes.
 {¶ 71} "Q. And does not AA also cover NA, narcotics anonymous?
 {¶ 72} "A. Yes, sir.
 {¶ 73} "Q. But yet you admit because you're an honest man —
 {¶ 74} "A. Yes.
 {¶ 75} "Q. — that that marijuana[1] was yours?
 {¶ 76} "A. Yes, sir.
 {¶ 77} "Q. But you're reformed.
 {¶ 78} "A. Yes.
 {¶ 79} "Q. Were you reformed then, or are you reformed now?
 {¶ 80} "A. Then and now.
 {¶ 81} "Q. Then and now.
 {¶ 82} "A. Yeah."
 {¶ 83} Although no objection was interposed to any of this line of questioning, Foster contends that the trial court committed plain error when it allowed the State to elicit testimony concerning his 1998 assault conviction, his 1992 domestic violence conviction and eleven convictions for disorderly conduct. Foster argues that because the evidence against him cannot be said to be overwhelming, the admission of this testimony should be deemed to constitute plain error. Foster misapprehends the significance of overwhelming evidence. Where there is overwhelming evidence of a defendant's guilt, even preserved error, if it is not structural, may not merit reversal, because it is deemed to be harmless in view of the overwhelming evidence of the defendant's guilt.
 {¶ 84} As the State notes, the test for plain error is a difficult one to establish. In one case, that test was described as follows:
 {¶ 85} "But for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983), 3 Ohio St.3d 12, at 14.
 {¶ 86} In the case before us, we consider it unlikely that the result of this trial would have been otherwise, had the evidence of Foster's prior convictions not been admitted. Even Fyffe, who generally corroborated Foster's version of these incidents, acknowledged that Foster had a violent temper. At least one previous Domestic Violence conviction was necessarily going to be laid before the jury, since that was an element of the two felony Domestic Violence offenses with which Foster was currently charged. The jury was correctly instructed on the elements of the offenses, and we presume that the jury based its decision to convict Foster based upon the relevant evidence, and not upon any prejudice resulting from its awareness of his prior convictions.
 {¶ 87} In short, we are not persuaded that the introduction of the evidence of these prior bad acts, without any objection by Foster, constituted plain error. Foster's First Assignment of Error is overruled.
 IV {¶ 88} Foster's Third Assignment of Error is as follows:
 {¶ 89} "A Party may not impeach his own witness without a showing of surprise."
 {¶ 90} "The credibility of a witness may be attacked by any party, except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid. R. 801(D)(1)(a), 801(D)(2), or 803." Evid. R. 607(A).
 {¶ 91} Although some of the prior inconsistent statements about which Fyffe was questioned by the State fall within the exceptions to hearsay set forth in Evid. R. 803, and are therefore outside the scope of the restriction against impeaching one's own witness set forth in Evid. R. 607(A), at least some — the written statements she gave to the police following each incident — do not fit within Evid. R. 803, and are therefore within the scope of Evid. R. 607(A).
 {¶ 92} It is within the broad discretion of a trial court to determine whether a party is taken by surprise by the testimony of a witness called by that party, so as to permit that party to impeach its own witness.State v. Minneker (1971), 27 Ohio St.2d 155. See, also, State v. Holmes
(1987), 30 Ohio St.3d 20. The evident purpose of this rule is to prevent a party from calling a witness with the sole purpose of impeaching that witness by her prior, out-of-court statements, which would otherwise be inadmissible. "Otherwise [i.e., but for Evid. R. 607(A)], the party would be entitled to call a known adverse witness simply for the purpose of getting a prior inconsistent statement into evidence by way of impeachment thus doing indirectly what he could not have done directly." Staff Note to Evid. R. 607.
 {¶ 93} The State called Beth Fyffe, the alleged victim, as a witness. During her direct testimony, Fyffe gave evidence which was helpful, if not essential, toward proving that she was a family or household member, an element of the Domestic Violence offenses. This is especially so in view of the fact that the State could not have known whether Foster would testify in his own defense. Fyffe also gave testimony that corroborated, at least in part, the State's versions of the April 13, 2003 and July 14, 2003 incidents. At the same time, however, she acknowledged that she continued to love Foster, and would, in her words, always love him. In her testimony, while acknowledging many of the facts comprising the State's version of the two incidents, she minimized the violent nature of these confrontations. She testified, for example, that she could not remember being pulled by her hair, or being choked. She did remember, with respect to the April 13, 2003 incident, having acquired a bald spot as the result of hair being pulled from her head, and she recalled, as part of the July 14, 2003 incident, Foster's having hit her "upside the head."
 {¶ 94} From our review of the record, we conclude that the State had a legitimate purpose in calling Fyffe as a witness. The State did not attempt to impeach Fyffe with prior, out-of-court statements during her direct testimony. After Foster cross-examined Fyffe, during which she gave some testimony that was helpful to Foster, the State did attempt to impeach her with some prior, inconsistent, out-of-court statements. In our view, the trial court did not abuse its discretion in permitting the State to impeach Fyffe on re-direct, and it was not even error, much less plain error, for the trial court to have permitted this line of questioning.
 {¶ 95} Foster's Third Assignment of Error is overruled.
 V {¶ 96} Foster's Fourth Assignment of Error is as follows:
 {¶ 97} "Appellant was denied a fair trial due to the ineffective assistance of trial counsel."
 {¶ 98} Foster cites State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373, second paragraph of syllabus, for the proposition that defense counsel's performance will not be deemed ineffective unless and until counsel's performance is proven to have fallen below an objective standard of reasonable representation, and, in addition, prejudice arises from counsel's performance.
 {¶ 99} Foster cites his trial counsel's failure to have objected to evidence of other bad acts, as described in Part III, above, and counsel's failure to object to the State's seeking to impeach Fyffe with her previous out-of-court statements, as described in Part IV, above, as the constitutionally ineffective assistance of trial counsel of which he complains. We have concluded, in Part IV, above, that the State could properly impeach Fyffe with her previous, out-of-court statements, under all of the circumstances then pertaining, so we necessarily conclude that trial counsel was not ineffective for having failed to interpose an objection thereto.
 {¶ 100} Arguably, Foster's counsel should have objected when the State offered evidence of his prior Disorderly Conduct convictions and his prior misdemeanor Assault conviction. However, Foster's prior conviction for Domestic Violence was necessarily going to be brought to the attention of the jury, since it constituted an element of the Domestic Violence convictions with which he was presently charged. His trial counsel made a strategic decision to acknowledge that Foster was "no saint." We do not know whether Foster's testimony, when asked about his prior Disorderly Conduct convictions, that he was a recovering alcoholic, was a trial strategy that had been discussed with his counsel. It may have been. In any event, it appears that Foster attempted to persuade the jury that he had problems with his behavior in the past, as the result of his alcoholism, encompassing both his previous Disorderly Conduct and Assault convictions, and his previous Domestic Violence conviction, but that he had since straightened out his life by participating in Alcoholics Anonymous, and recovering from his alcoholism.
 {¶ 101} We conclude that even if trial counsel was deficient for having failed to object to the State's reference to the prior Disorderly Conduct and Assault convictions, there is no reasonable probability that, but for this error, the results of the proceeding would have been different, which is the second prong of ineffective assistance of trial counsel required by State v. Bradley, supra, at 142. In reaching this conclusion, we have reviewed the entire transcript of the trial. We find Foster's trial counsel to have been generally diligent and able. Furthermore, although the alleged victim, who admitted that she continued to love Foster, minimized the violent nature of the April 13, 2003 and July 14, 2003 confrontations, she did not all together discount them, there was the physical evidence of the clumps of hair that had been pulled from her scalp on both occasions, there was the independent witness to the July 14, 2003 confrontation, and there was, finally, Foster's own damaging admission to his mother during the telephone conversation that was recorded and offered in evidence. Under these circumstances, we find it quite unlikely that Foster would have been acquitted of either of the Domestic Violence charges, or of the Felonious Assault charge, had the evidence of his prior Disorderly Conduct and Assault convictions been kept from the jury.
 {¶ 102} Foster's Fourth Assignment of Error is overruled.
 VI {¶ 103} Foster's Fifth Assignment of Error is as follows:
 {¶ 104} "Cumulative errors deprived the appellant of a fair trial."
 {¶ 105} Foster cites State v. DeMarco (1987), 31 Ohio St.3d 191,509 N.E.2d 1256, for the proposition that even though each of multiple errors may not, itself, rise to the level of prejudicial error, the cumulative effect of the multiple errors may. We have found but one claimed error having possible merit — that Foster's trial counsel was ineffective for having failed to object to the State's introduction in evidence of his prior convictions for Disorderly Conduct and Assault. We have also concluded, however, that this deficiency by trial counsel, if deficiency it was, was not sufficiently prejudicial to warrant reversal. See, Part V, above. We have found no other errors to cumulate with this error. Accordingly, the requisite finding of multiple errors is not met in this case, and State v. DeMarco, supra, has no application.
 {¶ 106} Foster's Fifth Assignment of Error is overruled.
 VII {¶ 107} All of Foster's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Brogan, P.J., and Wolff, JJ., concur.
[1] When Foster was arrested in connection with the July 14, 2003 incident, some marijuana was found on his person, and he pled guilty to a misdemeanor marijuana possession offense.